ROBERT H. PARKER, Adm'r, v. WILMINGTON & WELDON RAILROAD COMPANY.

*Negligence—Railroads.*

1. While crossing a railroad track the plaintiff's intestate was killed by a train which had left a station on schedule time and attained a speed of twenty miles an hour; the deceased was working at a steam-mill located near the track; when first seen by the engineer he was about 100 feet from the engine, and making no effort to get out of the way; the engineer put on brakes and shut off steam, but gave no signal by bell or whistle; *Held* that the contributory negligence of the deceased relieves the company of responsibility.

2. One crossing a railroad track must be on the alert to avoid injury from trains that may happen to be passing; and the omission of the engineer to give the precautionary signals of the approach of a train, when it in no way contributed to an alleged injury, does not impose a liability upon the company.

CIVIL ACTION for damages tried at Fall Term, 1879, of HALIFAX Superior Court, before *Avery, J.*

Verdict for the defendant. Motion to set aside verdict refused. Judgment for defendant, appeal by plaintiff.

*Messrs. J. B. Batchelor, Thos. N. Hill* and *Day & Zollicoffer,* for plaintiff.

*Messrs. Spier Whitaker* and *Gilliam & Gatling,* for defendant.

SMITH, C. J. The facts out of which arises the present action for damages in causing the death of James W. Parker, the plaintiff's intestate, are few and undisputed. The deceased was employed, and had been for sometime previous, at a steam mill erected on land of the defendant company, and with their consent, near the track of the road and about three-fourths of a mile distant south from the town of Enfield. Near the mill was a crossing over the road-bed, used by persons visiting it. On the afternoon of December 14th, 1878, according to schedule time, the regular passenger train with six coaches attached left the station at Enfield, and proceeding towards Wilmington had attained a speed estimated at the rate of 20 miles an hour, and was nearing the crossing, when the deceased, emerging from behind a building, was seen to enter upon the crossing and turn and move two or three steps in the direction of the advancing train. When first observed by the engineer, he was about 100 feet from the engine, and apparently unconscious of danger, and making no effort to get out of the way; the latter at once put on brakes and shut off steam to diminish the speed of the train, and give him longer time to escape. No signal was given by bell or whistle, and the officer in charge says

it was impracticable to do all, and he then, as now, thought
the course pursued was best calculated to avert a collision.
The intestate was stricken down and so severely injured as
to live but a few hours afterwards. The brakes were of the
most approved kind, and with the cutting off of the steam
could be made to bring the train, moving at the rate stated,
to a halt in 350 feet, and the superintendent of the road,
with many years' experience in running trains, concurred
in the opinion that the most prudent course in such emer-
gency was that taken by the engineer to slacken the speed
of the advancing train, and give more time for the deceased
to extricate himself from his perilous position. A witness
at the place, who saw what occurred, saw the deceased come
out and enter upon the crossing and move a step or two for-
ward with his hat covering his forehead and eating an ap-
ple when he was stricken down. The road at this point to-
wards Enfield was nearly straight, and the train could be seen
for several hundred yards in that direction by any one who
would look. There was no signal given at the approach to-
wards the crossing, nor was it customary to give any, as a
warning; and the working of the machinery of the mill
when in operation, made so much noise that the rumbling
of a train would hardly be discernible, until one entered
near the track and was beyond the houses which obstructed
both the view and hearing of it. There was evidence of
drinking habits of the deceased, and that he had drunk
something that day, but none to show intoxication when he
was smitten and killed, nor did any witness testify to any
indications of his being in this condition by his conduct or
speech. The deceased was 33 years of age and unmarried,
and was at once removed to Enfield. As soon as the train
could be stopped, the engineer went back to the place where
the deceased had fallen, and asked him if he was much
hurt, but received no answer.

During the examination of the plaintiff on his own be-

half, he was asked the two questions, which, after objection from the plaintiff, were allowed, and with the responses, are as follows:

1. Did you go back to Enfield to see about him?

I did not go, owing to the condition of my family. I could not leave them. My wife was so shocked at hearing the news, she went into spasms, and I did not think she would live till I got back, and I did not think it proper he should be brought home.

2. Could not your son have been buried at home without your wife's knowing it?

There was no burying ground there.

The questions were permitted as affecting the witness' credit.

The findings of the jury upon the series of issues submitted are in substance these:

The plaintiff's intestate was guilty of negligence at the time of receiving the injury, and could have avoided it by using ordinary care on his part.

The defendant, through the conduct of its agents, did not negligently run against the person of the deceased, nor was that conduct wanton and careless, nor was the intestate's negligence in being on the track known in time to enable the manager of the train to avoid the collision by the exercise of ordinary care and prudence.

The instructions asked for the plaintiff may be condensed in the following propositions:

It was gross negligence in the company's agent not to blow the whistle when approaching the crossing, and again when the deceased was first seen. When the perilous position of the deceased on the track and in front of the engine was seen, it was the engineer's duty to use ordinary care to avert the consequences of this negligent self-exposure, and if he fail to exercise such care, the company notwithstanding intestate's negligence, would be liable. The court declined

these requests, and so far as the instructions are the subject of exception, charged the jury as follows :

The rule of law in this state applicable to the case is that when an injury arises neither from malice, design, or gross and wanton neglect, but only from the want of ordinary care, and both parties are in fault, the party injured is taken to have brought the injury on himself. Then adverting to the rule that while the jury must ascertain the facts, the court must declare whether they import negligence as a matter of law, His Honor proceeds to say :

If the plaintiff's intestate went upon the track and suffered injury from the passing train, he would be deemed negligent in so exposing himself to danger, if by ordinary care and attention he could have either seen or heard the approaching train from his position or from the place of collision in time to have made his escape, and this would be so whether he was then at a regular or public crossing-place, or elsewhere on the road track. Upon these facts the intestate would be chargeable with negligence and an affirmative response should be given to the first issue. If however he was in the use of and passing over a public crossing-place, part of a road or highway, or used by defendant's license as a means of access to a public mill, and the engineer omitted to give the signal of his approach by blowing the steam-whistle, and the intestate was stricken and killed, not being able by the exercise of ordinary care and prudence to see or hear the noise of the coming train in time to have moved from the track without injury, then the intestate would not be guilty of such concurring negligence as would deprive the plaintiff of redress. Could the deceased with ordinary care and attention have seen, had he looked, or heard the noise of the train in time to have left the track and removed to a place of safety, and failed to so protect himself, his own negligence would be deemed the cause of his injury, and the company would not be responsible. That it would be neg-

15

ligence in the company, if nearing the crossing, whether public or used generally by license as a way to the mill, the engineer failed to give notice of his approaching train by blowing the whistle, whether any one was seen or not upon the track, and so if the engineer saw the intestate on the track and had reason from his manner or apparent condition to believe he did not see or hear the train, and failed to use the means at command to warn the intestate and had sufficient time to do so before the collision, the defendant would be negligent and responsible.

The charge is expanded to great length, but what we have reproduced presents the law as laid down and as resting upon the different hypotheses which the jury may adopt with sufficient precision to enable us to determine the correctness of the rulings.

Indeed the conceded facts leave little to the jury to pass upon. It is not controverted that the defendant's engineer did not and could not, by reason of an obstructing house, see the deceased until he was within about one hundred feet of him, and did then, as the expert testifies, do what was best to be done, and all that could be done to prevent the injury.

The intestate for some unaccountable reason seems to have been insensible to his danger, in full view of the rapidly advancing engine, and as if paralysed, made no attempt to get out of its way. The only possible imputation upon the prudent conduct of the engineer is in the omission to give the warning in season to keep off persons about to cross, but even this does not dispense with all personal attention to one's own safety. If the omission be neglect in the company, much greater is the neglect of the deceased who, when aware of the runnings of the regular trains, and just when one was expected, walks and remains upon the track without looking out for its approach, or making any movement to get out of its way, until rushing on, it strikes

him to the earth. It is to be presumed that a rational be-ing will not needlessly venture into places of peril, and if he does, that he will use proper precautions to guard against injury. If he fails to do either and suffers damage in con-sequence, it must be regarded as caused by his own rash act and inattention to his own security. " Negligence is a rela-tive term," remarks the court in *N. J. Ex. Co.* v. *Nichols*, 3 N. J., 439, " depending upon the circumstances under which the injury was received, and the obligation which rests on the party injured to care for his personal safety. A person crossing a railroad track, though rightfully there, must be on the alert to avoid injury from trains that may happen to be passing."

" The company's servants may ordinarily presume," is the conclusion derived from an examination of numerous cases by a recent author whose work exhibits large research and precision of statement, " that a person of full age and capacity who is walking on the track at some distance be-fore the engine, will leave it in time to save himself from harm ; or if approaching the track, that he will stop, if it becomes dangerous for him to cross it. This presumption may not be justified under some circumstances, as when the person on the track appears to be intoxicated, asleep or otherwise off his guard." Pierce Railroads, 331.

" The more approved statement of the doctrine of contrib-utory negligence," says the same author, " is that a person cannot recover for an injury to which he contributed by his own want of ordinary care." *Ib.*, 323.

The only culpability which can be charged upon the company is the failure to give the precautionary signal of the approach to an intersecting way where travelers might be expected to be found, and thus prevent their moving upon the track, but this omission when in no manner caus-ing or contributing to the injury, does not impose a liability upon the company. If the traveler knew by other means

of the coming train, the omitted warnings could not be deemed the cause of the collision. *Ib.*, 351.

But without accumulating references to the numerous decided cases, of which the defendant's counsel has furnished us many very much in point, we prefer to rest our decision upon the authority of a recent case, clearly resembling that before us, and in which a large array of cases was brought to the attention of the supreme court—*Railroad Company* v. *Houston*, 95 U. S. Rep., 697; Mr Justice FIELD says: "If the positions most advantageous for the plaintiff be assumed as correct, that the train was moving at an unusual rate of speed, its bell not rung, and its whistle not sounded, it is still difficult to see on what ground the accident can be attributed solely to the negligence, unskilfulness or criminal intent of the defendants' engineer. Had the train been moving at an ordinary rate of speed, it would have been impossible for him to stop the engine when within four feet of the deceased.   *   *   *   *   *   *   The *failure of the engineer to sound the whistle, or ring the bell, if such were the fact, did not relieve the deceased from the necessity of taking ordinary precautions for her safety.* Negligence of the company's employees in these particulars was no excuse for negligence on her part. She was bound to listen and to look before attempting to cross the railroad track in order to avoid an approaching train, and not to walk carelessly into the place of danger. Had she used her senses, she could not have failed both to hear and to see the train which was coming. If she omitted to use them, and walked thoughtlessly on the track, she was guilty of culpable negligence, and so far contributed to her injuries as to deprive her of any right to complain of others. If using them, she saw the train coming and yet undertook to cross the track, instead of waiting for the train to pass, and was injured, the consequences of her mistake and temerity can-

not be cast upon the defendant.    No railroad company can be held for a failure of experiments of that kind."

The instructions of the court are quite as favorable as could be asked for the plaintiff, and he at least has no grounds of complaint of the charge.    It may be a question whether the facts admitted of any hypothesis upon which the jury could find negligence in the defendant.

The testimony was that but 3 or 4 seconds would elapse before the engine would traverse the distance from it to the point at which the deceased was first seen, and that brief interval allowed only the use of the means adopted to slacken the speed of the train and afford more opportunity for him to escape.

But the verdict settles the fact that while the deceased was, the defendant was not negligent in causing the loss of the life of the former.

An exception to the evidence received remains to be considered.    This is in our opinion also untenable.

The indifference to his son's death which the inquiry proposed to elicit from the plaintiff, who testified, and who would be entitled to whatever should be recovered, might have some bearing upon the value of his evidence in estimating the pecuniary damages resulting from the death of the son.    But it is a sufficient answer to the objection to the question allowed, that the witness made no statement derogatory to himself, and fully explained his reasons for not allowing the body of the deceased to be removed and buried at his own residence.    The objection lies not to the question, but to the evidence it elicits, and when no answer is given, or an answer in direct opposition to the intimation conveyed in the query, no ground is afforded for exception.

The error, if there be error in admitting the question, is harmless and does not vitiate the verdict.

Upon a review of the whole case, we see no error, and the judgment must be affirmed, and it is so ordered.

No error.                                        Affirmed.